# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| **DEBRA CANTRELL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case number 4:06cv0912 TCM** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,[1]** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael

J. Astrue, the Commissioner of Social Security ("Commissioner"), denying the application

of Debra Cantrell for disability insurance benefits ("DIB") under Title II of the Social

Security Act ("the Act"), 42 U.S.C. §§ 401-433 is before the Court, see 28 U.S.C. § 636(c),

for a final disposition.  Ms. Cantrell has filed a brief in support of her complaint; the

Commissioner has filed a brief in support of his answer.

## Procedural History

Alleging a disability beginning on January 13, 2003, caused by arthritis and

depression, Debra Cantrell ("Plaintiff") applied for DIB in March 2004.  (R. at 59-65.)[2]

Her application was denied initially and after a hearing held in June 2005 before

---

[1]Mr. Astrue was sworn in as the Commissioner of Social Security after the filing of this action and is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

Administrative Law Judge ("ALJ") James E. Seiler. (Id. at 11-16, 33-37, 154-72.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 2-4.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff testified she was born on December 2, 1958, and was then 46 years' old. (Id. at 157.) She was right-handed, 5 feet 4 or 5 inches tall, and weighed 124 pounds. (Id.) She had been at this weight since January 2003. (Id.) She lived with her husband and her daughter, who was 10 years' old. (Id. at 157-58.) She had completed the eleventh grade, had not been in special education, and had no vocational rehabilitation. (Id. at 158.) She last worked on January 13, 2003, inspecting medical devices for quality control. (Id.) That job ended after four months due to absenteeism. (Id.) The absenteeism was due to back pain and depression. (Id. at 158-59.)

She had also worked for Watlow Electric doing assembly line work. (Id. at 159.) She had been fired from that job due to absenteeism caused by back pain and depression. (Id.) The pain radiates from the center of her back to her legs and arms. (Id.) There are no activities that decrease or increase her pain. (Id. at 160.) She described that pain as a numbing, constant pain. (Id.) She takes Ultram for the pain. (Id.) Dr. Campbell has been treating her for the pain for twelve years. (Id.)

Plaintiff also takes antidepressants. (Id. at 161.) She was not functioning mentally, socially, or physically. (Id.) Her daughter helps her get up and get dressed in the morning

and helps her get breakfast.  (<u>Id.</u>)  They are both seeing psychologists.  (<u>Id.</u>)  Plaintiff just started seeing Dr. Speilberg.  (<u>Id.</u>)  Asked to describe her symptoms, Plaintiff explained that she had crying spells, felt incapable, had no goals, had suicidal thoughts two or three times  a week, ate only one meal a day, and was very moody.  (<u>Id.</u> at 162.)

Plaintiff also has psoriasis on over half her body, including on her arms and legs. (<u>Id.</u> at 163.)  This embarrasses her.  (<u>Id.</u>)  She used to see a dermatologist, but was no longer being treated for the psoriasis.  (<u>Id.</u>)  She has had blackouts at least two or three times a month, each blackout lasting for five or ten minutes.  (<u>Id.</u> at 164.)  Consequently, she stays at home and no longer drives.  (<u>Id.</u> at 164, 166.)  After a blackout, she feels weak and dizzy.  (<u>Id.</u> at 164.)  After she fell last week, her chest hurt on the left side; x-rays were normal.  (<u>Id.</u> at 164-65.)  Approximately one year ago, she saw a neurologist.  (<u>Id.</u> at 165.) He prescribed Neurontin, which seemed to be helping.  (<u>Id.</u>)  The blackouts did not last as long.  (<u>Id.</u>)

Plaintiff further testified that she could walk, sit, or stand for fifteen or twenty minutes before the pain would cause her legs to be numb and tingle.  (<u>Id.</u> at 166-67.)  Also, she has no strength in her hands and has difficulty writing.  (<u>Id.</u> at 167.)  Pain prevents her from lifting more than five to ten pounds.  (<u>Id.</u> at 168.)

Plaintiff does not visit friends and her relatives do not live close.  (<u>Id.</u>)  She does not belong to a church or social group.  (<u>Id.</u>)  She bathes once a week and does not want to do any personal grooming.  (<u>Id.</u>)  She does not read and has no hobbies.  (<u>Id.</u> at 169.)  Asked what work she does around the house, Plaintiff replied, "Nothing."  (<u>Id.</u>)  Her daughter does everything.  (<u>Id.</u>)  Her husband does the grocery shopping.  (<u>Id.</u>)  She tosses and turns

at night and has bad dreams once a week.  (<u>Id.</u> at 170.)  A typical day begins with her getting up, sitting on the couch, and watching television.  (<u>Id.</u>)  She spends most of the day trying to sleep on the couch.  (<u>Id.</u> at 171.)  She does this until her daughter gets home.  (<u>Id.</u> at 170.)  Her daughter goes to her room when she gets home and watches television there.  (<u>Id.</u> at 171.)  Her daughter makes her own dinner.  (<u>Id.</u>)  Her husband does not come home for dinner.  (<u>Id.</u>)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her application, records from various health care providers, and evaluation reports.

When applying for DIB, Plaintiff completed a Disability Report.  (<u>Id.</u> at 99-105.) She listed her height as 5 feet 7 inches and her weight as 140 pounds.  (<u>Id.</u> at 99.)  Her impairments were arthritis in her spine and manic depression.  (<u>Id.</u>)  She was unable to sit for longer than a few minutes, had problems standing, could not sleep, and had severe nightmares.  (<u>Id.</u> at 99-100.)  Her impairments first bothered her in March 1999 and stopped her from working in January 2003. (<u>Id.</u> at 100.)  She had tried to continue working after March 1999 by working part-time.  (<u>Id.</u>)  This required her to stand a lot, resulting in absenteeism and ending in being fired.  (<u>Id.</u>)  The job she had held the longest was as an assembly worker.  (<u>Id.</u>)  She had been seeing Dr. Campbell since 1999 and had last seen him in October 2003.  (<u>Id.</u> at 102.)  She had also consulted Julie K. Wood, M.D., for depression beginning in 1996 and ending in April 2002.  (<u>Id.</u>)

After the initial denial of her DIB application, Plaintiff completed another disability

report on May 26, 2004.  (<u>Id.</u> at 85-91.)  She reported that since she had last completed a disability report, she had no appetite, had lost weight, was sick to her stomach, could not get out of bed, and had lost consciousness four times.  (<u>Id.</u> at 85.)  She listed May 10, 2004, as the date when these changes occurred.  (<u>Id.</u>)  Also, since May 20, her depression had increased.  (<u>Id.</u>)  She was getting weaker.  (<u>Id.</u> at 90.)  She had first seen Dr. Kent Campbell in January 2004 and had last seen him on April 11, 2004.  (<u>Id.</u> at 86.)  He had prescribed Effexor, an anti-depressant; she had no side effects from the medication.  (<u>Id.</u> at 88.)  She did not have another appointment with Dr. Campbell, and had seen no other health care providers.  (<u>Id.</u> at 86.)

Plaintiff had consistent annual earnings between 1983 and 2002, inclusive.  (<u>Id.</u> at 39.)  Beginning in 1991, she had annual earnings over $20,000 for ten of the twelve years up to and including 2002.  (<u>Id.</u>)  In 2003, her last year of reported annual earnings, she had $864.00 of income.  (<u>Id.</u>)

The majority of Plaintiff's medical records before the ALJ are those of Kent Campbell, D.O.

Dr. Campbell's records begin with an August 3, 2001,[3] visit by Plaintiff for complaints of a severe sore throat and back discomfort.  (<u>Id.</u> at 136.)  She asked that her spine be manipulated.  (<u>Id.</u>)  It was, "with good results."  (<u>Id.</u>)  She asked again in October, reporting that her back had been bothering her for a week.  (<u>Id.</u> at 135.)  She was unsure of the cause.  (<u>Id.</u>)  She denied any radicular pain in her lower extremities.  (<u>Id.</u>)  The range

---

[3]This record refers to an earlier visit.  Moreover, Plaintiff was clearly an established patient by August 2001.  These earlier records are in the administrative record.

of motion in her lumbar spine was "somewhat restricted" with "obvious discomfort on all movements."  (Id.)  Straight leg raising was negative at 90 degrees.  (Id.)  And, she had "considerable spasm and tenderness in the lumbosacral junction."  (Id.)  Her only current medication was Effexor.  (Id.)  Her spine was manipulated, again "with good results."  (Id.)  Three days later, however, Plaintiff returned with complaints of continued low back pain.  (Id.)  Overall, she was much better.  (Id.)  She had a full range of motion in her spine and upper extremities.  (Id.)  She also had some psoriasis on her elbows and knees.  (Id.)  Manipulation of her lumbar spine produced good results.  (Id.)  On November 8, Plaintiff complained of persistent low back pain.  (Id. at 134.)  Her examination was consistent with that of seven days before and the results of the manipulation of her spine were again described as "good."  (Id.)  Her next relevant visit to Dr. Campbell was on December 4.  (Id. at 133.)  She continued to have back pain.  (Id.)  This pain was described as dull and had moved into her thoracolumbar junction.  (Id.)  It did not radiate to her lower extremities.  (Id.)  Her spine was manipulated, with good results.  (Id.)  On December 27, she telephoned Dr. Campbell's office to report she was seeing a Dr. Chahval in a few days for kidney problems and to ask him to extend her work restriction.  (Id. at 132.)  He did so by one week.  (Id.)  The next day, she had a lumbar spine x-ray at DePaul Hospital.  (Id. at 132, 140, 153.)  The x-ray revealed slight degenerative spurring throughout the lumbar spine and was otherwise negative.  (Id. at 140.)  The same day, she returned to Dr. Campbell's office for her low back pain.  (Id. at 131.)  Although she had a full range of motion in her lumbar spine, her movements were "very slow" and "very uncomfortable."  (Id.)  Manipulation of her spine produced good results.  (Id.)

On April 4, 2002, Plaintiff consulted Dr. Campbell about her depression. (Id. at 130.) She explained that, although the Effexor had helped more than any other medication, she felt she was not experiencing the same effects of the medication as she previously had. (Id.) She requested that the dosage be increased. (Id.) She also reported that she liked to be in control of everything, including her husband, but knew that that was not a healthy attitude. (Id.) Dr. Campbell increased the dosage. (Id.) Plaintiff called on May 4 to report that she had lost her job. (Id.) The following month, she was given samples of the Effexor. (Id.)

On August 18, 2002, Plaintiff went to the emergency room at DePaul Health Center after falling at home. (Id. at 142-51.) She had not lost consciousness, but had lacerated her face and broken a finger on her left hand. (Id. at 144-45, 148.)

Plaintiff next saw Dr. Campbell on September 8, 2003. (Id. at 125, 129.) Her constant back pain was a dull ache and occasionally a sharp pain. (Id.) The pain was now radiating to her lower extremities. (Id.) The range of motion in her lumbar spine was "near complete with obvious discomfort on all movements[,] especially at the limit of flexion." (Id.) She reported that she had not worked for close to two years because of the back pain. (Id.) Dr. Campbell manipulated her spine and prescribed a low dosage of Vioxx, a nonsteroidal anti-inflammatory drug. (Id.) Three days later, Plaintiff telephoned that the Vioxx was not helping. (Id.) The dosage was increased. (Id.) Vioxx was replaced by Bextra, another nonsteroidal anti-inflammatory drug, on September 17 when Plaintiff again reported that Vioxx was not giving her any relief. (Id.) Five days later, Plaintiff called to complain that the Bextra was not giving her any relief. (Id. at 124, 128.)

The dosage was doubled. (Id.) Plaintiff telephoned again on September 30. (Id.) She was taking three times the prescribed dosage of Bextra; it was helping. (Id.) She was instructed that the prescribed dosage was the maximum. (Id.) A third nonsteroidal anti-inflammatory drug, Mobic, was prescribed. (Id.)

On October 8, Plaintiff reported "some back pain," no energy, constant fatigue, and lack of motivation. (Id.) She was easily aggravated and was not sleeping well. (Id.) The Mobic was giving her some relief from the back pain. (Id.) She had reduced the dosage of Effexor for financial reasons. (Id.) She had a full range of motion in her spine and shoulders. (Id.) Her grip strength was equal. (Id.) There was "spasm and tenderness in the paravertebral musculature throughout the spine." (Id.) The diagnosis was back pain and depression. (Id.) Her dosage of Effexor was increased; her Mobic prescription was renewed; her spine was manipulated, with good results. (Id.) On February 12, 2004, Plaintiff was given samples of the prescribed dosage of Effexor to tide her over until her mail order was received. (Id. at 123, 127.)

On February 24, Plaintiff reported to Dr. Campbell that she was so uncomfortable because of the back pain that her depression was worse. (Id.) She and her husband had filed for bankruptcy. (Id.) She did not sleep at night, and she was "somewhat restricted" in her range of motion of her spine in all planes. (Id.) Dr. Campbell prescribed Zanaflex, a short-acting muscle relaxant. (Id.) Her prescription for Effexor was renewed. (Id.) On April 2, Dr. Campbell prescribed Ultram, an extended-release pain reliever, after Plaintiff called to report severe back pain, shakiness, and nausea. (Id.) A week later, Plaintiff requested samples of Effexor. (Id. at 120.) Samples were again given in September,

December, and February 2005.  (Id. at 119-20.)  In June 2005, Plaintiff requested an appointment with Dr. Campbell after she fell off a porch.  (Id. at 118.)  She thought she had broken some ribs; an x-ray revealed she had not.  (Id. at 115, 117-18.)  She informed Dr. Campbell that she had stopped taking the Effexor four months before for some coagulopathy studies.  (Id. at 115.)  The studies were normal, and she wondered whether she should resume taking the Effexor.  (Id.)  Dr. Campbell concluded that "she probably needs to go back on her Effexor."  (Id.)

A request following the hearing to Dr. Spielberg with Psych Care Consultants for copies of Plaintiff's medical records was returned unfilled because there were no such records.  (Id. at 106-07.)

Plaintiff was referred by J. William Campbell, M.D.,[4] to Barry A. Singer, M.D., in August 2004.  (Id. at 110-11.)  She reported continuous low back pain for the past seven years with intermittent radiation of the pain down the lateral aspect of her thighs and calves.  (Id. at 110.)  The pain was exacerbated by prolonged sitting and standing and required that she frequently change positions during the night.  (Id.)  She also had numbness radiating down the lateral aspect of her legs.  (Id.)  Her strength was full; her balance was impaired.  (Id.)  She had tried physical therapy; it made the pain worse.  (Id.)  She had taken Celebrex and Bextra; they were ineffective.  (Id.)  Her symptoms included chest pain, palpitations, shortness of breath, dyspnea on exertion, abdominal pain, melena

---

[4]In addition to this Dr. Campbell having a different first name than the Dr. Campbell regularly consulted by Plaintiff, he has different credentials and office address.  There is no other reference in the record to this Dr. Campbell.

(dark, tarry stools), and nausea.  (Id.)  They did not include weight change or rashes.  (Id.)

On examination, Plaintiff was alert and oriented to time, place, and person.  (Id.) Her speech was fluent.  (Id.)  Her motor exam was 5/5, and she had no Babinski sign, her Romberg was negative, her straight leg raise was negative, and her gait was normal.  (Id. at 110-11.)  A magnetic resonance imaging ("MRI") of her lumbosacral spine in January 2004 had revealed mild degenerative disc disease at L4-5 and was negative for any significant neuro-foraminal stenosis.  (Id. at 111, 152.)  Dr. Singer concluded that her history was suggestive of bilateral L5 radiculopathies.  (Id. at 111.)  He prescribed Neurontin, opined that epidural steroid injections might be useful, and noted that she had an appointment with a pain clinic.  (Id.)

There is no record from a pain clinic.

The ALJ also had before him an August 2004 letter from Dr. Campbell and the report of a non-examining psychologist.

In May 2004, Ricardo C. Moreno, Psy.D., completed a Psychiatric Review Technique Form on behalf of Plaintiff.  (Id. at 70-83.)  He concluded that there was insufficient evidence form which to determine whether she had a mental impairment.  (Id. at 70.)  He also noted that Plaintiff had failed to complete and return forms sent to her for additional information.[5]  (Id. at 82.)  Consequently, benefits were denied.  (Id.)

Dr. Campbell wrote, in relevant part, as follows.

---

[5]A notation by an agency counselor refers to the forms as being a vocational report and a questionnaire about activities of daily living.  (See id. at 84.)

[Plaintiff] has complained of back pain since early 1998 and despite multiple attempts at improving same we have been unsuccessful. She has tried a myriad of different nonsteroidal medications as well as muscle relaxers and other classes of prescriptions which have not been helpful. She has developed overwhelming fatigue and depression. She does have significant psoriatic involvement not only on the extensor aspects many of her joints but large plague areas . . . .

Laboratory evaluations and consultations with specialists including rheumatology, etc have been unsuccessful in identifying a specific diagnosis and treatment which would reduce or alleviate her discomfort.

She has even had syncopal episodes and seizures which may or may not be related to the problems listed above.

She remains a challenge both diagnostically and therapeutically to the medical community and unfortunately we don't have much else to offer her. She does continue on a dual acting antidepressant which will hopefully keep her functioning at a minimal level at this time.

(Id. at 122.)

## The ALJ's Decision

Following the five-step sequential evaluation process delineated by the Commissioner, see pages 13 to 15 and 17, below, the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of January 13, 2003. (Id. at 12.) He next determined that she had a severe impairment of degenerative disc disease. (Id.) This impairment was not of listing-level severity, particularly because there was no motor loss. (Id.) Other impairments, i.e., seizures, depression, and psoriasis, were not severe. (Id.) The first, seizures, was not supported by any medical evidence. (Id.) The second, depression, had been treated only by medication, Effexor. (Id.) Plaintiff's assertions that she had been seeing a psychologist, Dr. Spielberg, were unsupported by the record and Dr. Singer's mental status examination did not reveal

any deficits other than one, difficulty with serial sevens, that was not inconsistent with her educational level. (Id.) The third, psoriasis, did not result in any limitations. (Id.)

The ALJ next discussed whether Plaintiff could perform her past relevant work as an assembly worker. This required an assessment of her residual functional capacity ("RFC"). In turn, this assessment required an evaluation of her credibility. (Id. at 13.) He found that the objective medical evidence did not support her allegations of a severely-restricted capacity to sit, stand, or walk, and of an inability to grip objects. (Id.) Specifically, the MRI, Dr. Campbell's examinations, and Dr. Singer's examination showed, at worst, a "'somewhat restricted'" range of motion in her lumbar spine and a slight reduction in height at L4-5. (Id.) Moreover, Plaintiff had had back pain since 1997, was able to work after that time, and there was no evidence of deterioration. (Id.) She was being conservatively treated and her primary analgesic, Ultram, was prescribed only for mild to moderate pain.[6] (Id.) The ALJ concluded that Plaintiff had the RFC to lift carry, push, or pull ten pounds occasionally, sit six hours in an eight-hour day, and stand or walk for a total of two hours in an eight-hour day. (Id. at 14.) This RFC enabled her to perform the full range of sedentary work. (Id.)

It did not, however, permit her to perform her past relevant work. (Id.) Applying the Medical-Vocational Guidelines, Plaintiff, a younger individual with a limited education, could perform work existing in significant numbers in the national economy. (Id.) She was not, therefore, disabled within the meaning of the Act. (Id.)

---

[6]According to the Physicians' Desk Reference, 2399 (55th ed. 2001), Ultram "is indicated for the management of moderate to moderately severe pain."

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B) (alteration added).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities. . . ." Id. (alterations added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more

than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e) (alterations added). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867.

"The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059

(8th Cir. 1998).

Additionally, the evaluation during the administrative review process of the severity of a mental impairment in adults must follow the technique set forth in 20 C.F.R. § 416.920a. This technique requires that the claimant's "pertinent symptoms, signs, and laboratory findings" be evaluated to determine whether the claimant has a medically determinable impairment. Id. § 416.920a(b)(1). The degree of functional limitation resulting from this impairment must then be rated. Id. §§ 416.920a(b)(2) and (c). This rating follows a specific format, identifying four broad functional areas and analyzing the degree of limitation in each area imposed by the mental impairment. Id. §§ 416.920a(c)(3) and (4). The degree of limitation in the first three areas is rated on a five-point scale: "[n]one, mild, moderate, marked, and extreme." Id. § 416.920a(c)(4). The degree of limitation in the fourth area, episodes of decompensation, is rated on a four-point scale: "[n]one, one or two, three, four or more." Id. A rating of "none" or "mild" in the first three categories and "none" in the fourth will generally result in a finding that the mental impairment at issue is not severe. Id. § 416.920a(d)(1). On the other hand, if the mental impairment is severe, the medical findings about that impairment and the resulting limitations in the four functional areas are to be compared "to the criteria for the appropriate listed mental disorder." Id. § 416.920a(d)(2). If the claimant has a severe mental impairment that does not meet or equal the severity of any listing, then the claimant's residual functional capacity is to be assessed. Id. § 416.920a(d)(3). Section 416.920a(e) requires that the application of this technique be documented. An ALJ is to document the application in his or her decision. Id.

The burden at step four remains with the claimant. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824. See also 20 C.F.R. § 404.1520(f). The Commissioner may meet his burden by referring to the medical-vocational guidelines (the "Grid") or by eliciting testimony by a vocational expert. **Pearsall**, 274 F.3d at 1219. The Grid may not be relied on if the claimant suffers from non-exertional impairments unless those impairments "do not diminish or significantly limit the claimant's [RFC] to perform the full range of Guideline-listed activities[.]" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (alterations added; interim quotations omitted). If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into

account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently," **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

**Discussion**

Plaintiff argues that the ALJ's adverse decision is not supported by substantial evidence on the record as a whole because (1) the ALJ failed to consider the entire record when assessing her RFC; (2) the ALJ improperly assessed her credibility; and (3) the ALJ erred by relying on the Grid and by not introducing testimony by a vocational expert. The Commissioner disagrees.

The duty to fully and fairly develop the record exists, "even when, as in this case, the claimant is represented by counsel." **Nevland v. Apfel**, 204 F.3d 853, 857 (8th Cir. 2000). Accord **Snead v. Barnhart**, 360 F.3d 834, 838 (8th Cir. 2004); **Weber v. Barnhart**, 348 F.3d 723, 725 (8th Cir. 2003). This duty arises "[b]ecause the social security disability hearing is non-adversarial . . . [and] the ALJ's duty to develop the record exists independent of the claimant's burden in the case." **Stormo v. Barnhart**, 377 F.3d 801, 806 (8th Cir. 2004) (alterations added). Also, this duty requires that the ALJ neutrally develop the facts, **id.**, recontacting medical sources and ordering consultative examinations if "the available evidence does not provide an adequate basis for determining the merits of the disability claim," **Sultan v. Barnhart**, 368 F.3d 857, 863 (8th Cir. 2004). If, however, a crucial issue is not undeveloped, the ALJ is not required to seek additional evidence. See **Goff v. Barnhart**, 421 F.3d 785, 791 (8th Cir. 2005). The question whether the ALJ failed in his or her duty to develop the record must be decided on a case-by-case basis. **Gregg v. Barnhart**, 354 F.3d 710, 712 (8th Cir. 2003.)

In the instant case, there were questions about Plaintiff's depression that were

undeveloped. Dr. Campbell's records begin to refer to her complaints of depression in April 2002 and refer in October 2001 to her taking an antidepressant. Such complaints had clearly been made before because those records refer to an antidepressant previously prescribed. Plaintiff continues to complain of being depressed throughout Dr. Campbell's records. The ALJ concluded that the depression was not severe because she had sought no other treatment for it. She reported, however, that she had consulted Dr. Wood for depression beginning in 1996 and ending in April 2002. There is no indication that Dr. Wood's records were requested. There is an indication that Dr. Spielberg's records were requested. This request was sent to an organization that did not list Dr. Spielberg as a member. The return of the unfilled request does not necessarily indicate, therefore, that Plaintiff never sought any mental health treatment other than that provided by Dr. Campbell, as the ALJ concluded. Although it was Plaintiff's counsel that sent the request, an ALJ's duty to develop a full and fair record is not forgiven by a claimant's own failure to adequately develop the record. See **Cunningham v. Apfel**, 222 F.3d 496, 502 n. 6 (8th Cir. 2000). Additionally, the ALJ cited the mental status examination of Dr. Singer as support of his conclusion that Plaintiff's depression was not severe. There is no indication in the record, however, of Dr. Singer's speciality, although there are references to Plaintiff seeing a neurologist who prescribed Neurontin, an anti-seizure medication, as did Dr. Singer and another reference to her seeing a rheumatologist. There is also no indication of who the Dr. Campbell was that referred Plaintiff to Dr. Singer.

The record that was before the ALJ included Dr. Campbell's letter describing Plaintiff's level of functioning as minimal, at best, when on antidepressants. This letter,

his records, and Plaintiff's testimony and reports alerted the ALJ to the need for records from Dr. Wood and to an evaluation from a consulting examiner.

As noted above, the Commissioner may not rely on the grids at step five if a claimant is limited by a nonexertional impairment.  See **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006); **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001).  Anxiety and depression may cause nonexertional limitations.   See 28 C.F.R. §§ 404.1569a(c), 416.969a(c).  Nonexertional limitations "affect an individual's ability to meet the nonstrength demands of jobs," Social Security Ruling 96-4p, 1996 WL 374187, *1 (1996), "that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling," 20 C.F.R. § 404.1569a(a).  "Non-exertional impairments that  'do[ ] not diminish or significantly limit the claimant's residual functional capacity to perform the full range of Guideline-listed activities' do not prevent use of the grids, however."  **Ellis v. Barnhart**, 392 F.3d 988, 977 (8th Cir. 2005) (quoting Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995)) (alteration in original).  However, "'where the evidence of exertional limitations is extremely limited, and the dispute focuses on whether the claimant has the emotional capacity to engage in sustained employment, resort to the grid is inappropriate.'"  **Foreman v. Callahan**, 122 F.3d 24, 26 (8th Cir. 1997) (quoting Tennant v. Schweiker, 682 F.2d 707, 709-10 (8th Cir. 1982)).  As also noted above, the burden shifts at step five to the Commissioner.  **Pearsall**, 274 F.3d at 1219.

Because the record as to Plaintiff's depression[7] was not adequately developed, resort

_____

[7]Plaintiff also argues that the ALJ erred by finding her seizures and psoriasis were not severe.  This conclusion is supported by the record.  Although Dr. Campbell refers to both in

to the grids was inappropriate.  See **Wiley v. Apfel**, 171 F.3d 1190, 1191 (8th Cir. 1999) (finding that ALJ had erred by relying on grid to determine whether claimant who suffered from nonexertional limitations could work).

### Conclusion

The ALJ erred by not developing the record as to Plaintiff's depression and, consequently, by relying on the Medical-Vocational Guidelines to find Plaintiff not disabled.  Accordingly, the case is remanded to the Social Security Administration for development of the record on the severity of Plaintiff's mental impairment.

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and that this case is REMANDED for further proceedings as set forth above.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 12th  day of  September, 2007.

---

his August 2004 letter as severe impairments and she testified to that effect, this conclusion is not supported by the record.  There is only one reference in Dr. Campbell's records to Plaintiff's psoriasis and that is in October 2001 to her having "some" psoriasis on her elbows and knees. She also testified that she was no longer being treated for psoriasis.  And, although she testified about frequent blackouts, when she went to the emergency room after she fell, she denied having lost consciousness and she did not otherwise seek medical treatment for the blackouts.